Good morning, Your Honor. May it please the Court. Sydney Tribe here on behalf of the appellants to Snohomish County Public Utility District. We are asking this Court to reverse the District Court's judgment finding that the PUD violated the Washington law against discrimination when it terminated Cynthia Stewart after disciplining her for coming to work impaired in violation of work rules. Can I ask you, just right from the get-go, was she fired for coming to work impaired or was she fired for testing positive? She was fired for coming to work impaired. Well, on the other claim, the claim on which you prevailed, the judge decided that she came to work impaired and then she was sent for testing and she tested positive and then she was fired. Because part of the process of determining whether or not she was impaired was having the testing. Okay, so you just wrapped that in. That's a subset. Yes, rather than simply relying on the perceptions. All right. I'm sure you're aware, but your briefing uses those terms interchangeably, and so you've answered my question. I apologize if I was unclear. Not at all. That's fine. Thank you. There are two different ways in which the trial court made an error in making its decision. First of all, in determining that the termination was, in fact, discriminatory and that her medical condition was a substantial factor in her termination. And second, that the PUD failed to reasonably accommodate her by offering her leave, both paid and unpaid under the work rules, that would allow her to refrain from coming to work impaired. The termination was not discriminatory because coming to work impaired was the conduct that she engaged in for which she was terminated. She was not terminated because she had migraines or because she took narcotics in order to treat those migraines. It was the conduct of coming to work impaired in violation of work rules that led to her termination and was the sole cause. That sounds good, but the big question that the district court had to answer was, were the signs of impairment a part of the disability? The signs of impairment, the district court did find that the signs of impairment were part of the disability. Correct, and the district court decided, based on the Washington Revenue Code 4960-0407A and other parts relating to disability and impairment, that he had to determine whether the signs of the impairment were part of the disability. And, counsel, is that a fact question? Yes, that would be a fact question. That's a fact question, and so therefore, what deference do I owe him? This court can decide. What deference do I owe him? You would absolutely defer to a finding of fact if it's based on substantial evidence. Frankly, there was a finding of fact that the signs of impairment in this particular situation were a part of the disability. And, frankly, I don't see anything that would suggest that there's no evidence to suggest that. However, the court does not have to rule on that issue or reverse the trial court's decision on that issue in order to find that her termination was not discriminatory. But just a minute, if it's a part of the disability and she was terminated because she had an impairment and those signs were there, then at that point it is discriminatory. No, because she was not terminated for the state of being impaired or for acting impaired. She was terminated because she failed to follow the work rules that said, if you are impaired, do not come to work. You don't have to find. But just a minute. She is not impaired. If what her impairment is is a part of her disability, then she's not impaired. She is disabled. And you're terminating her for the very disablement she has. No, not terminating her for the disability. You're sure you are because you terminated her for coming to work impaired. You're saying she was impaired. And the district court finds that the impairment is a part of the disability. She was not terminated for being impaired or for conducting herself as an impaired person. And I think a way of explaining this is to compare this case with Gambini, upon which my opponent relies. Before you go into Gambini, my answer, and I'm sorry, this feels like boot camp. We're not discriminating against you either. We do this to everyone. But part of impairment, you said, is the positive test result. That seems to be baked into your analysis of impairment. She can't come to work without that, right? She's going to, according to this expert testimony and according to the judge's findings, she's going to test positive, period, right? If I'm understanding the question. It's a simple question. Part of impairment, as you defined it, part of impairment is the positive drug test. She's going to test positive, right? Yes, that's correct. Because of her disability. Yes. How do we remove that from your definition of impairment? The impairment is whether or not she is perceptibly impaired and acting impaired. She might come to work and act completely normally if she were drug tested, which she wouldn't be because she'd be acting normally and not acting impaired with slurred speech and et cetera. Then she might have a positive drug test, but she wouldn't be impaired. But the judge's finding of fact is that she wasn't terminated for that reason. She was terminated for testing positive. The finding of fact, and it's finding of fact 76, was that she was terminated for violating the work rules. There is actually another finding of fact that's, I could probably put my finger on it here in a minute, but it says on the Family Medical Leave Act claim that she was sent for, that they were frustrated with her for taking leave, that they sent her for testing because they thought she was impaired. She was fired for testing positive. That's what the judge said. But that's not what the factual record showed. She tested positive. So forgive me, but as to the standard review, which we have to be very mindful of, we have to decide that this finding of fact is incorrect about why she was fired. Yes, and there's no substantial evidence to suggest that she was fired for testing positive. She was fired because she came to work impaired. They tested her. They wouldn't have known she was impaired if you hadn't sent her for the drug test. No, they did know she was impaired. Just a minute. They suggest she's impaired, but if she's impaired, she's disabled. The way they knew or the way they supposedly knew she's impaired is because they sent her for the drug test. That's why I think we have to look about whether the impairment was a part of the disability. If the impairment is a part of the disability, then at that point you cannot fire someone for being impaired. That's part of the disability. The taking of the drugs, the taking of whatever you've got to do in order to come to work, the effect thereof on you, as long as they're on you, you can't fire them for because it's a part of the disability. And that's what the district court said. The district court said there is no part of what she did here which is not a part of the disability, and therefore you fired her. Therefore, any type of impairment when it relates to this disability is a part of it, and you can't fire. If this court wants to rule that as a matter of law, an employer can. No, I'm not ruling it as a matter of law. I'm saying that's what the district court said. How can I overturn it? I have to give deference. Yes, but as I said, this court can conclude based on all of the findings, including the findings that she was impaired and the uncontested findings that there was a work rule prohibiting employees from coming to work impaired, that the firing was not for the impairment. The firing was for coming to work. Well, is there any evidence that shows that her impairment was not a part of the disability? No, Your Honor. Again, the argument is that the ‑‑ Is your position that the ‑‑ maybe it's not, that you could not have accommodated her? At least to the extent that she's going to test positive, you couldn't have accommodated her? No. Well, our position was A, she was accommodated by being offered leave while she was during periods of impairment, and that that should have ended the inquiry. Okay, but even though your definition of impairment includes this positive test result, so let's set that aside for a minute. Now you're talking about the conduct, her manner and affect, if I can use that shorthand, violated the work policy. And let me clarify, Your Honor. The testing positive is not a sign of impairment. The testing positive is a confirmation that she was, in fact, impaired by drugs. If that's your position, that's really tough for you, because the expert that she called and the judge makes findings about this, that the levels were set at such a place that it could have meant that she had a poppy seed muffin. So that's really tough. But the trial judge concluded, the district court judge concluded, that she was impaired in finding of fact 68. She was impaired. He also concluded that she was treated, and this is what's really tough for me, and your time's ticking. So it seems to me that after she tested positive after the first go-around and the recertification agreement, it's very troubling to me that the agreement to come back treated her like anybody who had ever tested positive in a random drug test. It doesn't mention her disability. The district court was certainly concerned about that. And that seems quite inconsistent with the notion that she was accommodated. The first notice that the PUD had that she was taking these drugs to treat her migraines was after she had come to work impaired. And then later, a month later, her doctor told her that she, yes. Is part of your case, and I'm interrupting you again, but is part of your case that she had an obligation pursuant to your work rules to let you know that she was going to be taking that medication while she was employed? It's certainly part of the, it would have been helpful to the interactive process. But is it part of your rule? Are you claiming that she broke the rule by not telling you? No. Okay. The question is whether or not the PUD accommodated her and whether it engaged with her once it had notice, whether it engaged in her in a way that accommodated the disability. And the judge found, go ahead, please. Sorry. Let me ask you this question then. Let's move to accommodate. Is the reasonable accommodation issue a question of fact? Whether or not the accommodation was reasonable under the law is a question of law. Just a minute. Was the reasonable accommodation of this particular client a question of fact? No. It isn't a question of law as to whether you gave her a reasonable accommodation. Find me the case that says that. The law says that an accommodation. The law says you have to give her a reasonable accommodation. Yes. And then you have a question of fact as to whether it was reasonable. Yes, that's correct. And the judge found you did not make a reasonable accommodation. Do I owe deference? No, because there's no substantial evidence to suggest that this accommodation was. There's no substantial evidence? That's correct. If I find substantial evidence, do you lose? Yes, Your Honor. And how much is substantial? The question is the district court said that it was unreasonable accommodation because she was asked to come to work as soon as possible. That is not an unreasonable. What the law says is that an accommodation is reasonable if it allows the employee to keep working. She was offered adequate leave to allow her to keep working. Therefore, that finding of fact is not supported by the law. And it's not supported by substantial evidence. I see your argument. What about use of the FMLA? It seemed to me that it was pretty uneasy to use the FMLA when immediately upon telling her she could use the FMLA, she was told, and if you do, you can't go on vacation. That's not what happened, Your Honor. That's what the record suggests. No, she stated that she was concerned that if she used her FMLA, she would not be able to take paid vacation. And what did your company say? They said that she needed to not violate her return-to-work agreement and work rules by coming to work impaired. Okay. I'm just trying to see if there's substantial evidence here. I guess that's what I'm trying to see. We're barely letting you get into word exercise, but could you just say maybe the answer to one more question? Yes. The judge also made a finding on reasonable accommodation that she was, I am paraphrasing to be sure, but pressured or discouraged from using the four-hour time. What is your response to that? She was. But it wasn't available to her because she was discouraged from using it. The district court's finding that she had all the leave available both in writing and in fact as she took the leave when she needed it, and the fact that the PUD actually told her, look, we would prefer if you did not come to work impaired, we would prefer if you took her leave, meant that she was not denied any of her leave under the FMLA. In fact, quite the contrary. She was asked to take the leave, and she insisted not only that she didn't want to take the leave, but that she didn't need to take the leave, that she could come to work, and that it wasn't a problem and that she wasn't impaired. So that's why this was not a violation of the FMLA. And if she had the leave available, then she had the reasonable accommodation, and therefore there was no violation of the LILLAD. Judge Payne, do you have questions?  Do you want to save a little time? Yes, thank you. Okay. Good morning. Good morning. May it please the Court, my name is Joe Schaefer on behalf of Cynthia Stewart, who is here with us today. I will be handling the WLAD arguments while my colleague here, Katie Chamberlain, will be handling the cross-appeal leave claims. I want to start by just addressing a couple of things raised in argument just now. One is that there are no facts that we need to look behind in this case. Facts were not appealed. Facts that are not challenged on appeal are a verity upon appeal, must be accepted by this Court. Why was your client terminated? Our client was terminated because, in the words of the PUD, because they concluded that she had been impaired. That's the finding of fact I want to talk about. Why did he think she was terminated, please? Because she had been perceived to have come to work impaired, confirmed with the drug test results. So you agree that the drug test result was part of that? Absolutely, yeah. And I agree that the PUD used the drug test results to terminate her. I also say that there is a finding of fact that the judge very clearly found that the test results were useless in determining a degree of impairment. He did. He found that pretty clearly. So what do we do about the fact that I think, again, I'm paraphrasing, but there was an agreement about, is it called, you're referring to it as the recertification agreement, what the terms were going to be when she came back, and she signed it. And it treats her as though she has no disability at all. She can't test positive. That's exactly the problem with the return to work agreement. So what do we do about the fact that she agreed to it? There were two things that were going on there. There's the return to work agreement, and then there was also the FMLA paperwork that went in in parallel. On the return to work agreement, the first thing I would say is you can't contract around the law. And so you can't have an agreement that says we don't care if you have a disability. If you test positive, you're fired. So can I just back up? Those two agreements were executed within a day of one another, right? Yes, originally first, but then the PUD realized that that wasn't proper, and so they then separated the two and had them in two different processes. Okay, so what was the deal, if I can say that, at the time she came back? What did she think she had to comply with? That, according to the FMLA paperwork, because the four-hour thing comes in in the FMLA paperwork. So with the four-hour limitation, that any time that she was using a potentially impairing substance to treat her migraines, that she would wait four hours before she returned. So it's not that she may wait, that she was required to wait. Required to wait, absolutely. I took it from opposing counsel's argument. There were times when she indicated she didn't need to wait, that she was okay. No, she thought she could return immediately, and in fact, that's what her doctor had originally said. But after the recertification, just to be clear, because there's so many issues here, after the recertification agreement was executed and she came back, at that point, was the deal that she would wait four hours? Absolutely. Okay. That's the way I read it, too. And is there a contention? Was there a contention by her employer that she didn't do that sometimes? The only thing that you can see in the record is there's a footnote in the findings of fact and conclusions law that addresses a 15-minute discrepancy on the second day that she was found to have been showing signs of impairment, but the court found that to be insignificant. There is a dispute as to whether or not this 15-minute window even mattered. So there's no finding that she came to work in under, definitive anyway, that she ever came to work in under four hours after the recertification agreement? Certainly no finding to that effect. Thank you. Yes. As it relates to, I just want to make sure because it seems to me that I have to give deference to the district court on some issues, even if I don't agree. That's true. And it seems to me that the determination by the district court that there were, that the impairment was a part of the disability was a question of fact, right? That is, Your Honor. And I would also point out that for the first time in this litigation and its reply brief, the PUD has conceded that definitively. At page 22 of its reply brief, it says, First, the PUD does not dispute that the impairing effects of Stewart's medication are a part of her disability. That is the first time that's happened in this litigation. But it's undisputed here. Undisputed now. Okay. All right. And she's not in a safety-sensitive position. Absolutely not. That's correct. So if they decide that she's taking this medication and it's part of her disability and she has to take it, and setting aside that they're going to have to raise the blood level, the trigger for just testing positive, if you just give, what would they say? That's actually useless, but yes. Right, right, right. So for her it is anyway. So what are they supposed to do by way of how much do they have to accommodate if she's in a position where the medication's after effects otherwise leave her impaired in the sense of it's affecting her conduct or affect? What's reasonable there? That's an interesting way to put it, and I think it goes directly to what the court actually found. The district court found that she showed signs of impairment, and I think that's key. Right. Because then the court immediately went on in both instances and said there was no evidence presented that she actually had a performance issue or that it affected her ability to do the duties of her job that day. Why that's significant is signs of impairment could be for completely unrelated reasons. I mean, somebody could have stroke symptoms and be slurring their speech. That is a sign of impairment. It does not mean that that person is, in fact, impaired. So, I mean, I think that was a very important distinction. Your Honor, though, asked the question about how much needs to be accommodated. Eventually, it's how much does the finer of fact say that the person needs to be accommodated. Because the question is reasonable accommodation. Reasonable accommodation, and that under the Frisino case, it must be iterative so that if one accommodation does not work, you've got to go back to the drawing board and try something else. Here, it seems easy that the easiest thing to do would have been to simply say four hours didn't work, and so let's try six, or let's try a whole day, so anytime you take the meds, you stay home for the rest of that day. Those would have been easy solutions. And at some point, if she had to take the whole day too often, if she wasn't able to do the job, then that's going to trigger an accommodation that's no longer reasonable to expect from the employer. That could be. You could have eventually reached that. That was never reached here. I would say that at least the FMLA gives some guidance as to how much would be too much. It authorizes up to 12 weeks of leave, even in intermittent circumstance. So one thing I would like to turn toward is the line of cases that the defense is using regarding drug addicts and alcoholics. Those are completely in opposite to this case, and I want to tell you very clearly why. The Humphrey case of this court in 2001, specifically, that's where this language that we've all been reviewing, that the conduct resulting from a disability is considered to be part of the disability rather than a separate basis for termination. That case in the footnote, in footnote 18, addresses the only exceptions to that rule, and that is alcoholism and illegal drug use. So right there, it carved out that. It was addressing the ADA. But then what happens is the Humphrey case is adopted by the Washington Supreme Court in real in 2004 with that exact phrasing that conduct related to a disability is not a separate basis for the termination. And then that, of course, language gets echoed in the Gambini case again by this court who said, now that Washington has adopted Humphrey, we can rely on that. Let me go to the affirmative defenses. Yes. The first affirmative defense was good faith, and the judge says that's not recognized in Washington, right? That's absolutely true. And that's a question of law. That is. And nobody's even challenging that. That's true. The second one was a bona fide occupational qualification. Yes. That's a question of fact, is it not? It is. And so what I have to do is I have to give the district court some deference as to the facts which were necessary to determine whether it was a bona fide occupational qualification or it wasn't. That's true. And at this point, the judge has said it isn't. That's true. What's the best facts we have to sustain that decision? The decision that it was not a bona fide. Well, I think the first question is what is it that you're suggesting is not that she has to have that she doesn't have? So what is the qualification she's not meeting? And if the qualification is coming to work not impaired, then, yes, we do not take the position that she was permitted to come to work under the influence of narcotics. That's never been our position. But what has to happen is we have to find an accommodation that would allow her to work, to continue working and not be impaired at work by taking extra leave. I would like to. So then, as I understood it, he said the position was not safety sensitive. True. And any impairment was temporary and, therefore, it couldn't have been a bona fide business necessity. It's my understanding the judge ruled as a matter of law that cannot be a defense here. That is true. But he said even if it is, these facts say it isn't applicable here. That's true. And I'm to give deference on the second part. That's absolutely correct. And then when I get to the failure to accommodate, let's look at their three failure to accommodate things. What are the facts suggesting the district court was correct that the use of the FMLA was the accommodation? It was. They're suggesting that the use of the FMLA was an accommodation, and, therefore, they did accommodate, and they reasonably accommodated. What's your answer? Well, certainly, using the FMLA is part of the accommodation process. But then what happened is they had offered and given the accommodation, and then they took it away. And they did not do what's required under Frisino, which is an iterative process. You have to go back to the drawing board if something doesn't work. They perceived something didn't work. They should have then reconsulted with the doctor, which they never did, reconsulted with her and said, how can we solve this problem? What about the pressure that she'd lose vacation or whatever? The pressure, and especially the pressure to return to work as soon as possible, was what the district court found was made the promise of unlimited leave to be illusory. If the Court doesn't mind, I'd like to turn over to Ms. Chamberlain. May it please the Court, Katie Chamberlain for Ms. Stewart on her cross appeal. The district court made all the right factual findings in this case, but then overlooked Ms. Stewart's simple medical leave violation claims in its conclusions of law. So are you skipping to the fifth issue? Was the district court's determination that the PUD did not violate the FMLA by discouraging leave and using it as a negative factor, is that your argument? Your Honor, we do believe the district court's conclusion of law in that regard was incorrect. However, it skipped over the much more straightforward medical leave violations that do not require intent. Judge Smith, I think when you were just questioning my counsel, you mentioned that the use of FMLA was the accommodation. That's exactly right. The district court found, as a matter of fact, and law, that the PUD unlawfully fired Ms. Stewart when it was required to accommodate her and that the accommodation she needed was additional leave. And so by firing her instead of providing her additional leave, it violated both the disability law, as Mr. Schaffer was just explaining, and also the medical leave laws. Where do you address, and I'm trying to make sure I understand what you're saying here, there's one issue that they violated the FMLA and the WFLA by terminating her employment rather than permitting her to use additional leave and return to work. But I didn't see that argued any place in front of the district court. The district court didn't say anything about it in his decision. And frankly, I'm trying to figure out why I would then use that issue. Yes, Your Honor, that was part of this case from the inception of litigation. I've got the complaint in front of me. It's part of the record 1943. Well, I looked at your pretrial brief. It only issues the one where the PUD did not violate by discouraging leave. I look at your post-trial brief. It only looks at the second issue. I look at the findings of fact and conclusions, and it only reaches the last issue, and therefore I thought that was the one we were going to talk about today. Thank you for pointing that out, Your Honor. It's the negative factor piece that you saw briefed there, and that was the one piece that was not overlapping between the two claims, the disability claims and the medical leave claims. The failure to accommodate her disability constituted a violation of both the WLAD and the medical leave law claims. The medical leave law, the only thing that Ms. Stewart had to prove to show that the PUD denied her medical leave was that she was entitled to leave and that the PUD failed to give it to her. And the district court's findings were – Well, he said that they – he makes a finding on the other claim that she was discouraged from using it, but that she was fired over here, he says, because she tested positive. She sent – I'm sorry, that they were annoyed, frustrated – I don't think he used the word annoyed – frustrated with her for using leave, thought she was impaired, sent her for testing, and that's why they fired her. That's right, Your Honor, and the court looked at the negative factor analysis. There are three potential claims. There's failure to provide medical leave. There's also failure to reinstate, and those are intertwined. And there's also negative factor. Negative factor does require some proof of intent, and we think the court applied the wrong standard because you seemed to apply a but-for standard when the Lew case versus Amway says that it's clear it's any factor. But just stopping you, when I look at what he says about the standard, he applies the correct legal standard. He doesn't use the but-for standard. Where does he – where – could you point up a – I'm looking at his order. Can you tell me what paragraph I should be looking at? Yes, Your Honor, it's paragraph 115. That's what I'm looking at. Yeah, and he says – Stewart fails to show by a preponderance that the PUD used for taking an MLE leave as a negative factor when it disappointed. That's where you want me, right? That doesn't have anything to do with but-for. Well, 115, it says the PUD was chiefly concerned with something else but that there was some evidence of frustration. Your Honors, we believe, for the reasons set forth in our brief, that the court erred there, but there's an easier claim here. Don't worry about the clock. Just answer this question for you because this is important. Sure. On 115, if you would, please, what is – how does this tell me that he's using the wrong standard? Okay, the district court found that while the record contains some evidence that the managers were frustrated with her absences, it is also apparent the PUD was chiefly concerned about Stewart's suspected drug use. Right. But the – I'm sorry, it was the Batchelder case out of the Ninth Circuit that explicitly rejected an analysis of what was the main factor in the decision and said that it cannot be a factor at all. The words at all are italicized in the Ninth Circuit's opinion. So your problem is where 115 says that she fails to show by a preponderance. He's supposed to be looking to see whether this was any factor? That's right, Your Honor. And I was also concerned that he was looking at what was the PUD's main concern or chief concern, which was rejected in Batchelder. But we need not get there, Your Honor, because of the very strong language in the factual findings by the court. And I'll read right from it. Why not? Because in 116, counsel, it says, however, there's insufficient evidence to establish a causal connection between taking the leave and the adverse employment actions. That's right. That's what the court found regarding the negative factor analysis. Right. Right. And I think that he was wrong because it looks like from 115, he was playing a chief, what were they chiefly concerned with? But, Your Honor, we need not get there because the court found that when it became apparent that the PUD, excuse me, when it became apparent to the PUD that four hours may not be enough, the PUD fired Stewart without considering other alternatives. And this fell far short of the PUD's duty to affirmatively adopt reasonable accommodations and alternate accommodations are not difficult to conjure, and the district court finds four, and each of them are leave. Okay. So although the PUD initially went through this process of saying, you're allowed to take leave for four hours, when it was on notice that four hours was not enough, it fired her instead of providing her additional leave. Okay. You're now way over your time. And we've taken you over. I appreciate your argument very much. Thank you. Counsel. Could you please put a minute on the clock? Thank you, Your Honor. Very quickly on this question of the other alternatives, as we explained in our briefing, one of the alternatives was supposedly to force her to stay home unpaid instead of coming to work, which could also be an adverse employment action, which would have landed us right in this exact same spot. So whether or not that was an alternative reasonable accommodation, I think there's no case law that suggests that forcing an employee to take unpaid leave is a reasonable accommodation. Second of all, the question of whether the PUD was required by law to allow her on a day-to-day basis to come to work, assess her level of impairment, and decide whether or not she was capable of working that day is not a reasonable accommodation. And that is what the district court suggested that the PUD should have offered. The PUD offered the reasonable accommodation of leave. The reasonable accommodation, as the district court found based on its findings of fact, was not prohibited. It was allowed both in writing and in action. And therefore, the accommodation was offered. That ends the inquiry, and the district court should have ruled in the PUD's favor. Thank you. Thank you all for your very helpful arguments. We'll take that case under advisement, and we'll stand in recess for the day.
judges: N.R. Smith, Christen, Payne